IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EGAN MARINE CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No.  09 C 1954 |
| v. | ) ) | |
| ADMIRAL THAD W. ALLEN, in his official capacity as Commandant of the United States Coast Guard, and UNITED STATES COAST GUARD, | ) ) ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Egan Marine Corporation ("EMC") seeks judicial review, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, of a $21,000 civil penalty assessed by the United States Coast Guard for six separate violations of tank-vessel-inspection regulations. The parties have filed cross motions for summary judgment. For the following reasons, the Coast Guard's motion is GRANTED and EMC's motion is DENIED.

**FACTS**

"When reviewing a final administrative action by the Coast Guard, the court is limited to the evidence in the administrative record." *Green v. United States Coast Guard*, 642 F. Supp. 638, 641 (N.D. Ill. 1986); *see also Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009) (substantial-evidence review limited to administrative record unless challenge to agency action cannot be evaluated without further factual development).  Notwithstanding this well settled rule, EMC has submitted thirteen exhibits—consisting primarily of printouts from

the Coast Guard's Port State Information Exchange website relating to the vessels at issue—that are not included in the administrative record. (*See* Dkt. Nos. 13, 31.) EMC does not even try to identify any applicable exception to the general rule that a district court's review of a final agency action is limited to the administrative record; nor does it offers any reason why it could not have presented these exhibits to the Coast Guard for consideration during the penalty hearing or appeal. Therefore, for present purposes, the facts of this case are those in the administrative record. EMC's factual assertions that cite only improper exhibits will be stricken unless another basis for them is patent in the administrative record.[1] Accordingly, the facts are as follows.

*Preliminary Assessment of Civil Penalties*

On February 5, 2004, Coast Guard marine inspector James D. Metza conducted an inspection of the Egan tank vessel identified as EMC 310. Upon reviewing the certificate of inspection ("COI") for EMC 310, Metza discovered that it had not been inspected for over two years. So when he returned to the Coast Guard Marine Safety Office ("MSO") in Chicago, Metza performed an evaluation of the tank vessel fleet owned and operated by EMC and discovered deficiencies with 13 vessels, including failure to conduct annual inspections. On February 17, 2004, the MSO sent EMC a letter in which it identified these deficiencies and asked EMC to explain what it intended to do to correct them. The MSO informed EMC that if it did not correct the deficiencies by March 17, 2004, the COI for each noncompliant vessel would be either suspended or revoked pursuant to 46 U.S.C. § 3313(b)(4). Daniel Egan, EMC's operations manager, provided the requested status update on February 24, 2004, without objecting to any of the cited deficiencies. Between February 24 and March 9, 2004, Daniel Egan spoke to Metza several times, both over the phone and in person, and assured him that the

---

[1] Several of EMC's factual assertions and responses to the Coast Guard's factual assertions are unsupported by the evidence they do cite in the administrative record. The court has stricken these entries as well.

problems with EMC's barges were an "oversight on his part" and that he "would do everything humanly possible to resolve the situation."

On August 12, 2004, the Coast Guard Officer in Charge of Marine Inspection ("OCMI") at the MSO initiated civil-penalty proceedings against EMC for violations of Coast Guard tank-vessel-inspection regulations. Specifically, the OCMI charged EMC with ten violations of 46 C.F.R. § 31.10-17(a) for its failure to conduct annual or periodic inspections on ten individual tank vessels (EMC 309, 310, 404, 304, 332, 423, 472, 491, 494, and 506) and recommended a $5,000 penalty for each violation, for a total penalty of $50,000. The OCMI forwarded the case file to the Coast Guard Hearing Office. The case file, which is included in the administrative record, comprises a twenty-two page enforcement summary, providing details of each violation; sixteen exhibits, including Inspector Metza's statement of investigation, notes identifying the evidence of each violation, and the COIs for each of the vessels, showing the date of the last inspection for each vessel and the COI's expiration date; and correspondence between EMC and the MSO.

On December 9, 2004, Commander M.F. Thurber, the assigned hearing officer, issued EMC a preliminary assessment letter after conducting an initial review of the case file. In the letter, Thurber identified the alleged violations; the applicable Coast Guard regulations and procedure for civil-penalty cases, directing EMC to 33 C.F.R. § 1.07; the role of the hearing officer; and the maximum civil penalty of $325,000 that could be assessed for the cited violations. Thurber informed EMC that it had a right to examine the entire case file and provided EMC with a copy. Lastly, Thurber stated that based on a review of the case file, it appeared that violations did occur, for which a $75,000 total penalty was appropriate: a $5,000 penalty for nine of the ten vessels; and a $30,000 penalty for EMC 506, as it was a larger vessel

warranting a larger penalty. However, she would not make a final decision until EMC had an opportunity to respond; she informed EMC that it had a right to make a written request for a hearing or submit written evidence in lieu of a hearing. There is no indication that Hearing Officer Thurber had any prior connection to the case.

On January 5, 2005, Thurber granted EMC's request for a thirty-day extension to respond to the violations alleged by Inspector Metza, pushing the deadline for a response to February 12, 2005. On February 11, EMC requested a hearing; in its letter, EMC alleged that the MSO had a standing problem with inaccurate recordkeeping and that its records were inaccurate in this case. On February 22, Thurber informed EMC that a hearing would be scheduled in Cleveland, Ohio, on or about April 27, 2005. On April 4, EMC informed the Coast Guard that it could not attend a hearing on that date, but that it would call to reschedule a hearing at the Coast Guard Hearing Office in Arlington, Virginia. EMC never rescheduled the hearing.

In the spring of 2005, Thurber retired from the Coast Guard, and a new hearing officer, L.J. McClelland, was assigned to EMC's case. There is no indication that McClelland had any prior connection to the case either. On June 21, 2005, McClelland sent a general notice letter to EMC, reminding it that it had not yet rescheduled a hearing and that the case would be extended to July 25, 2005, to allow EMC to do so. McClelland asked EMC to provide any documentation it had regarding its claims, since that could potentially eliminate some of the charges in advance of the hearing. On July 26, EMC informed the Coast Guard that a barge explosion on January 19, 2005 had strained its personnel resources and made it impossible for EMC to focus on the civil-penalty case. McClelland accordingly granted EMC another extension of time, until August 31, 2005, to respond to the general notice letter. On October 2—nearly two months late—EMC responded, stating that it would not provide any documentation regarding the MSO's

allegedly inaccurate records until the hearing.  Pursuant to EMC's request, McClelland contacted EMC's president, Dennis Egan, to inform him that the hearing would be held on November 16, 2005, in Cleveland, Ohio.  When Dennis Egan said that he could not attend a hearing on that date, McClelland offered to hold the hearing in Arlington, Virginia, on a more convenient date. Although Dennis Egan said that he would contact the Coast Guard regarding that option, he never did.

On November 29, 2005, McClelland sought to supplement the case file with any information from the MSO that might support EMC's claims.  The MSO responded on December 23, informing McClelland that EMC had missed the 2003 inspection cycle.  The MSO provided the following inspections update on the ten cited tank vessels: (1) EMC 423 exploded on January 19, 2005, and was a total loss; (2) EMC 304, 310, 332, 472, and 494 had their COIs suspended or revoked by the OCMI due to missed annual inspections or expiration of the COI; (3) EMC 494 was issued a new COI after it was brought into compliance on August 25, 2005; (4) EMC 309 was inspected and cited for three deficiencies, and was out of service because EMC had not remedied the deficiencies; (5) EMC 303, 491, and 506 had been subsequently inspected and were in service.  The MSO stated that all of the cited barges missed an annual inspection within the timeframe identified in the charge sheet.  The MSO further stated that the burden of ensuring vessel inspections rests with the owner/operator of the tank vessels and that it was not the MSO's responsibility to prove that the annual inspections of the vessels were completed.

On January 9, 2006, Hearing Officer McClelland still had not heard from Dennis Egan, so she sent another general notice letter to EMC, extending the response date to February 10, 2006.  She also informed EMC that, in the hope of narrowing the issues, she had sought

clarification from the MSO regarding EMC's inspection claims, but that the MSO's response offered little conclusive information other than that EMC 423 had exploded. In the same letter, she explained the MSO's statements regarding a vessel owner's responsibilities, namely, that while it is a vessel owner's responsibility to ensure annual inspections, it is the Coast Guard's burden to prove the violations for which civil penalties are assessed. She further explained that the Coast Guard had presented evidence of violations, that EMC could seek to rebut that evidence, and that she remained open to any specific evidence EMC could produce to support its allegations that vessel inspections had been conducted by the Coast Guard but not recorded properly by the MSO. On February 9, 2006, the hearing was finally scheduled for March 14, 2006, in Arlington, Virginia. McClelland explained that, pursuant to 33 C.F.R. § 1.07-55, the hearing would be "informal in nature."

### *The Civil-Penalty Hearing*

A verbatim record of the March 14, 2006 hearing was not created, as none was required by the regulations. But Hearing Officer McClelland prepared detailed notes on EMC's presentation, i.e., oral arguments by Dennis Egan and Robert Wondolowski, EMC's traffic manager, and eight accompanying exhibits. (They are compiled in the administrative record.) EMC did not request any Coast Guard witnesses, and none were present. Nor did EMC argue at the hearing that the Coast Guard had assessed penalties that were excessive, or against Commandant Instruction 16200.3A (the "Civil Penalty Guide"), or failed to take into account EMC's ability to pay; or that the civil-penalty process had denied EMC its due-process rights. Dennis Egan did, however, remark that he had stopped addressing alleged violations with the Coast Guard itself because, in his view, the matter needed to be resolved by a federal court instead.

In its defense, EMC (through Dennis Egan) argued that the charges against it were largely the result of the Coast Guard's inadequate record keeping, and he further noted that the Coast Guard never told the company that it would have to keep its own set of records pertaining to the inspection of its vessels. With respect to each vessel, EMC submitted the following testimonial and/or documentary evidence:

(1) EMC 304: COI showing that an annual reinspection had been performed, although the date of the reinspection is unreadable; testimonial evidence that EMC had requested the Chicago MSO to perform an annual inspection on December 22, 2003, but that the request was denied as untimely;

(2) EMC 303: COI showing periodic and annual inspections performed on February 25 and July 22, 2004, respectively; testimonial evidence that EMC 303 had been laid up in the shipyard for repairs when the 2003 annual inspection would have been due;

(3) EMC 332: COI showing an annual inspection on August 20, 2004; an "835 permit to proceed" from the USCG Pittsburgh dated September 18, 2003, allowing EMC to move EMC 332 to the shipyard for repairs; a marine chemist certificate, dated April 7, 2003, showing that EMC 332 had been gas-freed so that it could be repaired;

(4) EMC 423: testimonial evidence that the barge was a total loss on account of the January 2005 explosion;

(5) EMC 472: testimonial evidence that the barge was being changed to a type 2 hull in 2002; gas-free certificates dated February 10 and March 28, 2005;

(6) EMC 491: COI showing a periodic reinspection on March 2, 2004, following MSO-approved "major modifications" during which the vessel was out of service;

(7) EMC 506: testimonial evidence that the barge was being changed from a type 2 hull in

(8) <u>EMC 310</u>: testimonial evidence that the barge was laid up for repairs, and that an annual inspection was performed when the repairs were completed, on February 6, 2004;

(9) <u>EMC 309</u>: testimonial evidence, along with supporting documentation, that on January 30, 2003, EMC requested and received a permit from the USCG Pittsburgh to proceed back to the shipyard in Lemont, IL for a needed repair, where the Chicago MSO inspected EMC 309 but failed to sign the COI.

On May 8, 2006, Hearing Officer McClelland sent EMC a general notice letter discussing the company's exhibits and other information presented at the hearing. She invited EMC to supplement its exhibits with any additional evidence that might rebut the Coast Guard's evidence that EMC's vessels had not been inspected. EMC did not submit any additional evidence.

On September 19, 2006, McClelland issued a final letter of administrative hearing in which she reviewed all the evidence presented at the hearing and announced the decision of the Hearing Office: (1) The charges pertaining to EMC 303, 304, and 332 were dismissed, since the evidence was insufficient and "confusing at best," and because EMC had presented evidence that EMC 332 had been out of service at the time the annual inspection was due. (2) The $5,000 penalty assessed against EMC 423 was reduced to a warning since the barge had exploded and was no longer in service. (3) As to the remaining six vessels, the Hearing Office upheld the charges and imposed a total reduced fine of $31,000. (Broken down: EMC 472, 494: $3,000 each, reduced from $5,000 each; EMC 491: $1,000, reduced from 5,000; EMC 506: $15,000, reduced from $30,000; EMC 310: $4,000, reduced from $5,000; EMC 309 $5,000, not reduced.)

### *Final Agency Action*

On October 16, 2006, EMC timely appealed the decision, lamenting that "the only way to

take this action to Federal Court is go [*sic*] through this process." In a letter to the Commandant signed by Dennis Egan, EMC characterized the $31,000 fine as "not only outrageous, but also completely unfounded" and alleged again that Coast Guard has often failed to kept track of inspections properly—this time adding his belief that the Coast Guard did so "maliciously." On October 24, McClelland forwarded EMC's appeal to the Coast Guard district office that initiated the civil-penalty process for comment. The district office responded that it had no additional comments on October 30, and on November 22, McClelland forwarded EMC's appeal to the Commandant of the Coast Guard.

The Coast Guard issued its final decision on January 28, 2009, finding that Hearing Officer McClelland's determination was not arbitrary and capricious, and that it was based on substantial evidence in the record. The Coast Guard noted that Hearing Officer McClelland had gone to "great lengths to bring forth all of the evidence relevant to the proceeding" and had allowed both the MSO and EMC to supplement the record. The Coast Guard reduced the penalty assessed to EMC 506 from $15,000 to $5,000, noting that Inspector Metza had recommended such a penalty at the outset. Thus, a final penalty totaling $21,000 was assessed.

## **LEGAL STANDARD**

The Administrative Procedure Act, 5 U.S.C. §§ 701-706, governs judicial review of a final agency action. When a federal court reviews an agency's action "on the record of an agency hearing," it may set aside the agency's action only if it "unsupported by substantial evidence." *Id.* § 706(2)(E); *Green*, 642 F. Supp. At 641 (§ 706(2)(E) applies to review of final agency action, pursuant to hearing, by Coast Guard). "Evidence is substantial if a reasonable person would accept it as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 709 (7th Cir.

1993) (evidence is substantial if there is a "rational relationship between the facts as the [agency] finds them and [its] ultimate conclusion"). In making this determination, the court may not substitute its judgment for that of the agency by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding issues of credibility. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

## ANALYSIS

### *Due Process*

EMC contends that the Coast Guard violated its Fifth Amendment right to due process by imposing a civil penalty without affording it (1) a hearing conducted by an impartial factfinder or (2) a meaningful opportunity to examine Coast Guard witnesses; and (3) by not issuing the civil penalty in a timely matter. Inadequate agency factfinding, in violation of due process, warrants *de novo* review of agency's action in federal court, which EMC accordingly requests. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). EMC's arguments, however, have no merit.

*First*, EMC argues that it was denied a hearing before an impartial factfinder. For one thing, the hearing was conducted by "the same agency which had brought the claimed violations against EMC in the first instance." This argument is frivolous, and its underlying principle would wreak obvious havoc with the entire administrative state. *See Withrow v. Larkin*, 421 U.S. 35, 47-48 (1975) (court may not presume agency's adjudicatory board to lack impartiality simply because same agency both investigates and adjudicates case); *Bakalis v. Golembeski*, 35 F.3d 318, 325-26 (7th Cir. 1994) (same). Next, EMC points out that "the administrative record is replete with requests by EMC to have this matter determined by a federal court," since EMC was "dubious" of the Coast Guard's ability to be impartial. True, but EMC's own "feeling"

regarding the Coast Guard's lack of impartiality does not, by itself, entitle EMC to bypass the entire process of administrative review and proceed directly to federal court; nor does it entitle EMC to *de novo* review upon its arrival.

Lastly, according to EMC, the administrative record shows that the Chicago MSO kept inaccurate records. EMC provides neither argument nor authority for its claim that this adds up to a violation of the Fifth Amendment, but the gist of EMC's position seems to be this: since Hearing Officer McClelland accepted EMC's claim that the Chicago MSO kept faulty records with respect to some of EMC's vessels, she could not rely on any records from the Chicago MSO to impose any civil penalty on any of EMC's vessels whatsoever. That is a non sequitur. What's more, Hearing Officer McClelland's manifest willingness to declare some of the Coast Guard records inadequate and to find for EMC on that basis undercuts EMC's claim that she was incapable of impartial judgment. After all, she did not mindlessly accept the Coast Guard's records as unassailable truth; rather, she sifted through the evidence marshaled in support of each separate charge, finding that the Chicago MSO had evidently erred in some cases but not in others. That was her determination to make, and this court will not upset it—or review the matter *de novo*—where the record reveals no reason to think that the hearing officer was incapable of impartially deciding EMC's claims.

*Second*, EMC argues that it was denied a meaningful opportunity to examine Coast Guard witnesses because it was never advised of its right to request their attendance at the hearing. In particular, the Coast Guard never informed EMC that it could request the attendance of the Chicago MSO officers who were responsible for inspecting EMC's vessels or for maintaining the MSO's records. As an initial matter, EMC did not raise this issue in its appeal of the hearing officer's decision. *See Sims v. Apfel*, 530 U.S. 103, 108 (2000) (courts should respect

agency regulations requiring issue exhaustion in administrative appeals by declining to consider unexhausted issues); *see also* 33 C.F.R. § 1.07-70. But EMC's argument has no merit anyway. There is no dispute that in correspondence with EMC, Hearing Officer McClelland alerted EMC—on at least three occasions—to the regulations governing Coast Guard hearings at 33 C.F.R. § 1.07. Most saliently, § 1.07 provides that a party to a hearing may request to have witnesses testify either in person or by written statement, and may request the assistance of the hearing officer in securing a witness' personal appearance. 33 C.F.R. § 1.07-50. It is unclear what more EMC could expect the Coast Guard to say without lapsing into the role of counsel.

*Third*, EMC argues that the Coast Guard violated the Fifth Amendment by failing to issue the civil penalties against EMC in a timely manner, as nearly five years elapsed between the MSO's initial inspection of EMC's barges in 2004 and the Coast Guard's final decision in 2009. EMC did not present this issue to the Coast Guard on appeal either, but again its argument fails for simple reasons. EMC contends that—because of the Coast Guard's delay in adjudicating its claims—it was unable to call and question Coast Guard witnesses about the circumstances of the initial investigation of EMC's vessels and the Chicago MSO's recordkeeping practices at that time. This is so, according to EMC, because those officers are "presumably" no longer at the Chicago MSO, and "[i]t may be, in fact" that they have left the Coast Guard altogether. This rank speculation establishes nothing. Moreover, EMC must show that it was prejudiced by the delay, *Hall v. Bowen*, 830 F.2d 906, 910 (7th Cir. 1987), but if the prejudice claim arises from an alleged lack of access to witnesses at the hearing, EMC cannot count the nearly three years' time *after* the hearing, up until the Coast Guard issued its final-agency-action letter, as part of the relevant delay. The relevant timeframe is the approximately fifteen months between the preliminary assessment letter being issued to EMC and the hearing, and much of that time

elapsed because of EMC's requests to reschedule the hearing.  More importantly, however, EMC has not shown that the hearing came too late in the day for EMC procure essential witnesses—something EMC never even tried to do.

After reviewing the administrative record, the court concludes that EMC was granted a hearing in accordance with the regulations for the enforcement of civil penalties at 33 C.F.R. § 1.07, and those regulations "have been sanctioned by Congress and the courts as sufficient to satisfy the minimum standards of due process."  *Green*, 642 F. Supp. 642 (citations omitted). Therefore, EMC's due-process arguments do not provide any basis for this court to undertake a *de novo* review of the civil penalties assessed against it by the Coast Guard.  *See United States v. I.W.I. Indus.*, No. 86-595, 1988 WL 40949 (N.D. Ill. April 25, 1988) (Williams, J.) (de novo review of agency action denied where complainant received "notice of the proposed action, a description of the evidence supporting the action, ample opportunity to respond in writing and at an informal conference, a written decision taking into account the evidence submitted by the defendant, and an appeal").

### *Excessive Fines*

Next, EMC contends that the Coast Guard violated the Excessive Fines Clause of the Eighth Amendment, for two reasons: (1) the civil penalties assessed against EMC exceed the Coast Guard's own guidelines as set forth in the Civil Penalty Guide; (2) the Coast Guard failed to consider EMC's ability to pay when calculating the penalties.  As above, EMC did not raise these issues in its appeal of the hearing officer's decision, but its arguments, belated as they are, are easily disposed of anyhow.

*First*, EMC's argument that the civil penalties violated the Excessive Fines Clause because they exceeded the penalties set forth in the Civil Penalty Guide lacks merit.  EMC

assumes, entirely without argument, that a penalty exceeding the Coast Guard's guidelines *eo ipso* violates the Eighth Amendment. Even if that were true, EMC would still have to face the fact that the Civil Penalty Guide sets forth "recommended" rather than binding penalty ranges, *see* Commandant Instruction 1600.3A, at ¶ 8(c)(1), which do not even apply in cases involving major violations or, as is the case here, "recurring minor violations by the same party." *Id.* Where the same party is charged with recurring violations, "significant penalty sanctions should be sought (tending toward the statutory maximum) to discourage future noncompliance." *Id.* The maximum statutory penalty is $32,500 per violation, for a total penalty of $195,000. *See* 46 U.S.C. § 3718(a)(1) (Inspection and Regulation of Vessels—Carriage of Liquid Bulk Dangerous Cargoes).[2] Indeed, to underscore the seriousness with which Congress viewed the perils of maritime navigation, it provided that "[e]ach day of a continuing violation is a separate violation," thus subject to an additional fine, *id.*, but the Coast Guard did not impose this stringent rule on EMC. These facts have two important consequences. First, the premise of EMC's argument—that the Coast Guard violated its own internal regulations—fails. Second, the fact that the Coast Guard fined EMC approximately one-ninth of the statutory maximum ($21,000 out of $195,000) sinks EMC's argument that the civil penalties were excessive or disproportionate under the Eight Amendment. *See, e.g.*, *Newell Recycling Co. v. United States EPA*, 231 F.3d 204, 210 (5th Cir. 2000) ("[T]he fine assessed against Newell is only about 10% of the maximum fine for which Newell was eligible under the [statute]. Newell's fine, therefore, does not violate the Eighth Amendment.").

*Second*, EMC argues that the Excessive Fines Clause requires the Coast Guard to consider a vessel owner's "ability to pay" when assessing a civil penalty, and that it failed to do

---

[2] Section 3718(a)(1) sets the maximum penalty at $25,000, but that amount is adjusted periodically by the Federal Civil Penalties Inflation Adjustment Act, 28 U.S.C. § 2641, as amended by the Debt Collection Improvement Act. *See* 31 U.S.C. § 3701. As of December 23, 2003, the maximum civil penalty is $32,500. 33 C.F.R. § 27.3.

so here. EMC's reliance on *Chronos Shipping v. United States Coast Guard*, 957 F. Supp. 667 (E.D. Pa. 1997), for this proposition is misplaced. True, the court in *Chronos* noted that "ability to pay" is one of the factors the Coast Guard considers in setting civil penalties under 33 U.S.C. § 1232, but it did so in the context of determining whether an assessed penalty was punitive, not whether it violated the Eighth Amendment. *See id.* at 671-72. *Chronos* therefore provides no support for EMC's position. And for good measure, the Civil Penalty Guide explicitly provides that "[t]he burden of presenting information relating to financial factors [including 'economic impact of the penalty on the violator'] lies with the party," as such information is not a "required part of the violation case." Commandant Instruction 16200.3A, at ¶ 8(c)(3). Not only did EMC fail to raise this issue in its administrative appeal, it never presented any such information at the hearing. EMC's Eighth Amendment arguments are therefore unavailing.

*Substantial Evidence*

Lastly, EMC fails to argue that the Coast Guard imposed a civil penalty in the absence of "substantial evidence" of any underlying violation. *See* 5 U.S.C. § 706(2)(E). It does mention the closely-related "arbitrary and capricious" standard of review for agency actions, *see id.* § 706(2)(A), but its arguments are perfunctory and parasitic on those already disposed of: since the Coast Guard violated the Fifth and Eight Amendments, and the Civil Penalty Guide, its actions must have been arbitrary and capricious. Even without fussing over the standard of review, it is clear that this argument fails for all the reasons set forth above.

Indeed, it is clear that the Coast Guard acted on the basis of substantial evidence in assessing a civil penalty against EMC. The evidence adduced by the Coast Guard at the hearing, principally in the form of COIs for EMC's vessels, purported to show that several of those vessels had not been timely inspected. The hearing officer conducted a careful, vessel-by-vessel

assessment of that evidence and found that it supported the charges in the case of some, but not all, of EMC's vessels, and it reduced the civil penalties accordingly. The information contained in the Coast Guard's evidence—in particular, the COIs and the report by Inspector Metza—shows that there was a "rational relationship between the facts as the [agency] finds them and [its] ultimate conclusion," namely, that some of EMC's vessels had not been timely inspected in accordance with Coast Guard regulations. *See Mt. Sinai Hosp. Med. Ctr.*, 196 F.3d 703 at 709. The court therefore declines to upset the Coast Guard's determination that EMC was liable for six violations of tank-vessel regulations.

## **CONCLUSION**

For the foregoing reasons, the Coast Guard's motion for summary judgment is GRANTED and EMC's motion for summary judgment is DENIED. This case is closed.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: July 26, 2010**